Durfee, Judge,
delivered the opinion of the court:
On May 2, 1954, the Secretary of the Air Force directed that the plaintiff, then a master sergeant, be administratively discharged with a general discharge under honorable con *187 ditions under the provisions of Air Force Eegulation 35-66 dated May 31,1954, which pertained to homosexual conduct or tendencies. He was accordingly discharged on May 9, 1956. In this action he questions the validity of his discharge and seeks to recover damages in the form of various items of pay and allowances.
Before commencing this action, plaintiff sought without success to have his discharge changed to an honorable discharge and all reference to AFE 35-66 deleted by an Air Force Discharge Eeview Board. He attempted to obtain the same relief from an Air Force Board for the Correction of Military Eecords but the Correction Board refused to grant the relief requested.
The first issue raised by the defendant questions the authority of this court to review and determine the legality of the Secretary’s action in issuing a general discharge instead of an honorable one. The defendant’s position is that the Government may terminate the enlistment of an airman at any time and that such matters are not properly subject to judicial review. In the administrative proceedings leading up to this case, plaintiff did not challenge the right of the Secretary to terminate his enlistment but he did challenge the Secretary’s authority to issue the type of discharge herein involved.
In Harmon v. Brucker, 355 U.S. 579 (1958) the Secretary of the Army had issued discharges under conditions other than honorable to the plaintiffs in that case. In so doing, he took into account certain pre-induction activities rather than basing his action exclusively upon the records of their military service. The petition in the District Court requested a ruling that the Secretary’s action was void as in excess of his powers and an order directing him to issue honorable discharge certificates. The District Court held that it was without authority to review the determination of the Secretary of the Army and the Court of Appeals affirmed. Of these decisions, the Supreme Court said, at page 582:
The District Court had not only jurisdiction to determine its jurisdiction but also power to construe the statutes involved to determine whether the respondent did exceed his powers. If he did so, his actions would *188 not constitute exercises of Ms administrative discretion, and, in such circumstances as those before us, judicial relief from this illegality would be available.
In considering an Air Force discharge under other than honorable conditions, this court said in Clackum v. United States, 148 Ct. Cl. 404, 408:
It is late in the day to argue that everything that the executives of the armed forces do in connection with the discharge of soldiers is beyond the reach of judicial scrutiny. (Citing Harmon v. Brucker, supra.)
We shall therefore proceed within our jurisdictional authority to examine the legality of the action of the Secretary of the Air Force in issuing a general discharge under honorable conditions rather than an honorable discharge to the petitioner. In addition to challenging the court’s jurisdiction over this matter, the Government has attempted to blunt the plaintiff’s argument by minimizing the difference between the two types of discharges. It asserts that in a general discharge under honorable conditions mere reference by number only to AFE 35-66 (which pertains exclusively to homosexuality) does not carry with it any stigma or penalty such as resulted in Clackum v. United States, supra, where the petitioner was issued an undesirable discharge. This is an unmerited conclusion; the Air Force itself says that a general discharge “may be a disadvantage to an airman seeking civilian employment. A general discharge received by a female airman precludes her reenlistment.” AFR 39-10, dated October 27, 1953. The defendant has said in its brief that, in any event, the discharge was a reasonable and necessary precaution from the standpoint of the Air Force. Having rid itself of plaintiff, it goes on, the Air Force would hardly have wanted to make it possible for him to later reenlist somewhere else.
We need go no further in concluding that the discharge issued plaintiff is not the legal equivalent of the honorable discharge which he sought in the administrative review of his case. The refusal of the Air Force to issue plaintiff an honorable discharge in place of the general discharge does create a controversy of which we may take judicial cognizance.
*189 The other issues raised by the parties deserve fairly extensive review because of the rather unusual exercise in hindsight by the Air Force in this case.
Apparently the plaintiff was a good soldier except for the incidents of homosexuality which formed the basis for his final discharge. He had received citations and good conduct medals, had been selected as “airman-of-the-month” and was a member of an Air Force character guidance council while in Korea during his third enlistment period. Air Force psychiatrists who had examined him in 1952 and in 1956 found that he had no existing homosexual tendencies and advised that he be retained in the service. Incidents of homosexual conduct by the plaintiff which had occurred during prior enlistments had been investigated and reported and he had thereafter been honorably discharged from those enlistments. Plaintiff’s testimony before the board of officers convened in 1956 to consider his separation under AFB, 35-66 that he had refrained from homosexual conduct since 1953 stands unrebutted.
The plaintiff served through three enlistment periods from each of which he received an honorable discharge. He reenlisted in Korea in October 1954 and was subsequently transferred to Shaw Air Force Base, South Carolina. At that post he requested that he be given a national security clearance which resulted in a background investigation being initiated. In the course of the investigation the previously admitted acts of homosexuality again came to light and plaintiff was notified that a board proceeding under AFB 35-66 would be initiated against him. A board of officers was convened for this purpose before which plaintiff and others testified. The findings of the board which were made on March 29, 1956, after the close of proof and oral argument said:
Master Sergeant Jesse F. Murray AF 14 073 711, did engage in passive homosexual activities when if years old and later twice during 1949 and twice in 1953.
The 1949 and 1953 incidents occurred during his second and third enlistments. There was no evidence or finding of any acts of homosexuality after plaintiff’s fourth and final en *190 listment. The board recommended that he be discharged under AFR 35-66 with a general discharge.
The first of plaintiff’s several objections to the procedure of the board of officers is that it acted beyond its authority in receiving evidence of homosexual conduct during previous enlistments terminated by honorable discharge. He relies for support for his position on Harmon v. Brucker, supra, wherein the court said, in referring to the reliance of the Secretary of the Army on pre-induction activities in issuing the less than honorable discharges:
We think the word “records”, as used in the statute, means records of military service, and that the statute, properly construed, means that the type of discharge to be issued is to be determined solely by the soldier’s military record in the Army.[1]
The Court held that the consideration of pre-induction activities as a basis for less than honorable discharge could not be sustained in law and remanded the case to the District Court.
Everyone discharged from the military service must be furnished with a discharge certificate, with authority to issue them delegated to the appropriate Secretary.[2]
In the Harmon case, the Army’s construction of the statutory grant of power was found by the Court in paragraphy 2(b) of Army Regulation 615-375, where it is stated that “[t]he purpose of a discharge certificate is to record the separation of an individual from the military service and to specify the character of service rendered during the period covered by the discharge.” (Emphasis supplied.) Air Force Regulation 39-10, dated October 27, 1953, which pertained to the general provisions covering certain discharges and which was in effect at the time of plaintiff’s discharge, provides that an honorable discharge certificate will be furnished when an airman has satisfied certain criteria “durmg his current period of service.” (Emphasis sup *191 plied.) These criteria include approved character and efficiency ratings and freedom from conviction of a serious offense by court-martial during the current enlistment.[3] We think that by analogy to the Harmon case, the type of discharge to be issued in this case is to be determined solely by plaintiff’s military record during his current enlistment.
The record is clear that during plaintiff’s “current period of service,” from his final enlistment on August 21, 1954, until his final discharge on May 9,1956, his service measured up to the standards required for honorable discharge as set forth in the regulation. In addition to his regular duties, he served as a member of an Air Force character guidance council in Korea, and was also selected as “airman-of-the-month” and was awarded a one week paid vacation in Hong Kong. Special publicity was accorded to plaintiff’s reenlistment by an article and picture in the Fifth Air Force newspaper circulated in the Pacific area.
Plaintiff was therefore, on his record of current service, entitled to an honorable discharge. Having chosen to institute proceedings for his untimely discharge, the Air Force is bound by its own regulations. Service v. Dulles, 354 U.S. 363 (1957); Watson v. United States, 142 Ct. Cl. 749 (1958).
Since action under AFP 39-10 confines the scrutiny of an airman’s qualification for honorable discharge in this type of situation to his current enlistment, plaintiff’s separation under AFE 35-66 with a less than honorable discharge based solely on evidence and findings of misconduct during prior enlistments, was in violation of Air Force regulations. Since we hold as we do respecting the validity of plaintiff’s final discharge it is unnecessary to discuss other allegations of irregularity of proceedings raised by him.
Plaintiff is entitled to recover pay and allowances from the date of his discharge, May 9,1956, until August 20,1960, the date on which his final six year enlistment would ordinarily have expired. He has also claimed that in addition to, or in lieu of, active duty pay he should receive disability retired pay because of a service incurred disability. There *192 is no evidence that plaintiff ever raised this issue before filing his petition in this court, nor do we have any competent evidence of disability or right to compensation based thereon. All that plaintiff ever requested the various Air Force boards to do was to change his general discharge to an honorable one and to delete all references to AFR 35-66. That portion of his petition relating to disability retired pay is, therefore, dismissed. In addition to the back pay and allowances referred to above, the plaintiff is entitled to recover $391.54, accrued credits improperly withheld by the defendant at the time of his discharge as a purported recoupment of part of his final reenlistment bonus. And, for the same reasons, the defendant’s counterclaim asserted for the allegedly unearned portion of the reenlistment bonus is dismissed. Based on the foregoing findings and conclusions, judgment will be entered for the plaintiff with the amount of recovery to be determined pursuant to Rule 38 (c).
It is so ordered.
Reed, Justice {Bet.), sitting by designation; Laramore, Judge; MaddeN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States and resident of Durham, North Carolina. The date of his birth was August 17,1909.
2. Plaintiff served as an enlisted man in the United States Army from April 29, 1942, to October 28, 1945, when he was honorably discharged as a staff sergeant and reentered civilian life. During the period from July 27, 1947, to November 21,1948, he was enrolled in an inactive status in the United States Air Force Reserve. He thereafter served an enlistment in the Air Force as a staff sergeant from November 22, 1948, to January 26, 1950, when he was honorably discharged. Reenlisting in the Air Force on January 27, 1950, plaintiff served in the successive grades of staff sergeant, technical sergeant and master sergeant until August *193 20, 1954, when he was again honorably discharged. Ke-enlisting again in the Air Force on August 21, 1954, he served as a master sergeant until May 9, 1956, when he received a general discharge pursuant to Air Force Regulation 35-66, the validity of which discharge is challenged by plaintiff in this case. Throughout his military career, plaintiff was officially rated as excellent or superior in both character and efficiency.
Plaintiff’s last enlistment on August 21,1954, as provided in the enlistment form, was for six years “under the conditions prescribed by law, unless sooner discharged by proper authority,” and his normal separation date would have been August 20, 1960.
3. Under date of December 28, 1951, two applicants for enlistment in the Air Force, Bobby D. Hedgepeth and Kex B. Howard, and one enlisted man in the Air Force, Kemus E. Adams, executed sworn statements before Air Force Major John D. Moxley, plaintiff’s commanding officer, to the effect that plaintiff had made statements to them concerning homosexual conduct. Hedgepeth and Howard stated that on December 27,1951, plaintiff had suggested to them that they submit to fellatio to be performed by a man at Kaleigh, North Carolina. Adams stated that he had worked with plaintiff in the service for 15 months, that plaintiff had always talked about fellatio, and in his presence had asked prospective recruits how long it had been since they had had fellatio performed upon them. Adams was a master sergeant assigned to the Recruiting Station at Raleigh, North Carolina, where plaintiff was assigned. Adams further stated that Hedgepeth and Howard had informed him of the statements made to them by plaintiff on December 27, 1951, and that he had immediately reported the complaints of applicants Hedgepeth and Howard to Captain Johnson, Recruiting Officer of the Raleigh Recruiting Station.
4. As a result of these complaints, plaintiff was on December 28, 1951, with his consent hospitalized for psychiatric observation at the U.S. Army Hospital, Fort Bragg, North Carolina. Under date of January 18, 1952, Dr. Melvin Shulman, 1st lieutenant, M.C., a psychiatrist, made the following report of psychiatric examination:
*194 1. This is to certify that Jessie F. Murray, Master Sergeant, AF 14 073 711, Army and Air Force Recruiting Office, Raleigh, North Carolina, has been a patient on the psychiatric service of the USAH, Fort Bragg, North Carolina since 28 December 1951 and has been observed since this date by the undersigned. Available at the time of his hospitalization were sworn statements by Bobby D. Hedgepeth, Rex B. Howard and Master Sergeant Remus E. Adams to the effect that Master Sergeant Murray was observed to have invited Mr. Hedgepeth and Mr. Howard to participate in fellatio.
2. This man was born on 17 August 1909, the oldest of 6 children. His birth and development were normal and there is no history of early neuropathic traits. He completed high school and took 2 years of college work at Duke University but was forced to leave because of the economic situation at home. He apparently lived a normal life during these years. He then worked for the WPA and civil service as a clerk. He enlisted in the Air Corps in April 1942 and was discharged honorably in October 1945 after having worked the bulk of that time as a teletype operator and clerk in a control room. After discharge he worked for the Veteran’s Administration in Durham, North Carolina until he reenlisted in the Air Corps on 23 November 1948. Since that time he has worked at the Recruiting Office in Raleigh, North Carolina. He has received two promotions in the last 13 months. At present he is keeping steady company with a girl friend whom he hopes to marry this spring. His first heterosexual experience was at the age of 18. He describes a relatively active and normal heterosexual life since that time. He masturbated at an early age, but denies this activity since adolescence. This patient denies that he was ever attracted to members of his own sex before 6 or 7 months ago during a particularly strained period after having been jilted by an old girl friend whom he had planned to marry. At this time (6 months ago) the patient had fellatio performed upon himself by several different men, a total of 5 or 6 times. The patient was relatively intoxicated during each of these episodes. He denies that he would participate in such activities when completely sober. He denies any activities other than these few episodes mentioned. In reference to the sworn statements mentioned in paragraph one, the patient insists that he was merely offering the fellatio to Mr. Hedgepeth and Mr. Howard not with the intention of performing the activity himself but of getting someone *195 else to perform the activity if Mr. Hedgepeth and Mr. Howard were interested. The patient denies ever having performed fellatio himself; he insists the only homosexual activity he has ever participated in were the aforementioned episodes of fellatio performed upon him. He denies the excessive use of alcohol and claims he has been drunk only on infrequent occasions. He denies the use of any drugs.
3. During his stay in the hospital, the patient was at all times clear, coherent, relevant, in contact and oriented. There was no evidence of any disturbance of thinking or feeling. There was no sign of any mental derangement or psychosis. He has at all times been pleasant and cooperative and helpful with the psychiatric- staff. There has been no evidence noticeable that the patient willfully concealed or distorted the facts of his case.
4. Diagnosis : No psychiatric illness.
5. It is believed Sergeant Murray is not a homosexual.
6. There is no evidence of any mental disease, defect or derangement that interferes with this man’s ability to distinguish between right and wrong or his ability to adhere to the right. He is sane and responsible and is mentally competent to assist counsel and cooperate in his own defense.
7. The medical recommendation is that this man be retained in military service.
8. There are no medical contraindications to administrative disposition.
5. Following the report of psychiatric examination, plaintiff returned to duty at the Raleigh Recruiting Station where he discovered that the nature of the complaints against him had become generally known among both the military and civilian personnel. At his request, his commanding officer effected his transfer in early 1952 to Dobbins Air Force Base, near Atlanta, Georgia.
6. In late 1953 it became common knowledge at Dobbins Air Force Base that master sergeants were being selected in order of their Air Force service classifications for shipment to Korean assignments. Because it appeared to him that he had been passed over, plaintiff inquired of the base adjutant what difficulties existed, and was told that it had been noted on his personnel record that he was not eligible for shipment pending a decision by the commanding officer of Dob *196 bins Air Force Base. Plaintiff asked tlie adjutant if tire delay in action on his reassignment was due to the previous complaints against him concerning homosexuality, and the reply was in the affirmative. The adjutant stated that he believed the problem would be resolved favorably, and shortly thereafter plaintiff was assigned for shipment to Korea.
7. Plaintiff left Dobbins Air Force Base in November and arrived in Korea in December 1953 and was assigned to the Air Installations Squadron, Seoul City, Fifth Air Force, until mid-February 1954, when he was assigned detached service with the Armed Forces Assistance to Korea program. Throughout his entire military service, plaintiff was assigned to administrative and personnel duties.
Under date of March 31, 1954, plaintiff in Korea voluntarily made a written statement to an agent of the Air Force Office of Special Investigations at the request of the agent, concerning passive participation in two acts of fellatio while he was stationed at Dobbins Air Force Base. He advised that a certain proprietor of a floral shop at Atlanta, Georgia, had performed the acts upon him on two different occasions. He also stated that on the second occasion, he took with him an airman, whose name he could not remember, and that he believed that the proprietor performed fellatio upon the airman.
Under date of April 15, 1954, plaintiff again voluntarily made a written statement at the request of the same OSI agent in Korea. This statement was made in considerable detail, and covered facts concerning his military service as well as family and personal history. Plaintiff stated that while stationed at the Ealeigh Kecruiting Station he had been the passive participant in acts of fellatio on 4 or 5 occasions. He asserted that the complaints made against him at Ealeigh resulted from his refusal to permit enlistment of, ineligible applicants sponsored by Sergeant Adams, one of the complainants. He stated that in response to inquiry of the two prospective recruits, the other complainants, he had told them they could resort to prostitutes for a certain charge at a certain hotel in Ealeigh, or go to the basement of another hotel and find a homosexual without expense. *197 He then related the circumstances of the affidavits presented against him, his hospitalization for and clearance by psychiatric examination, and subsequent transfer to Dobbins Air Force Base. He stated that while shopping for flowers for a sick girl friend at a certain floral shop in Atlanta, Georgia, in February 1953, the male proprietor invited him to return that evening to see his champion dachshund dog. When plaintiff returned the proprietor gave him a drink of liquor, made sexual advances, and performed fellatio upon him. Plaintiff further stated that on two subsequent occasions when he had been drinking liquor, he went alone to the floral shop, and the proprietor performed fellatio upon him. He then related how he later took a young airman with him to the same shop at the request of the airman, and how they both resorted to having fellatio performed upon them by the proprietor. He stated that he had never been the active participant in such acts. He expressed great remorse for these mistakes, a determination to refrain from such acts, and a plea that he be permitted to remain in the Air Force.
8. As previously related in these findings, plaintiff was honorably discharged in Korea from his enlistment on August 21, 1954, and was immediately permitted to reenlist for six years. Under Air Force procedures and practices in effect at all times pertinent in this case, an airman was not to be transferred or reenlisted if either a board action or an investigation was pending concerning homosexual activity on his part. Defendant has conceded that no such board proceedings nor administrative action was pending against plaintiff at the time of his reenlistment on August 21, 1954.
After his reenlistment in Korea, plaintiff remained on duty there until November 1954, when by operation of the so-called point system, he became eligible for and was transferred to the United States and to duty assignment at Shaw Air Force Base in South Carolina. Subsequent to his last reenlistment, plaintiff served in addition to his regular duties as a member of an Air Force character guidance council in Korea, and was also selected as the airman of the month by a board of officers and awarded a one-week paid vacation in Hong Kong. Special publicity was accorded to plaintiff’s *198 reenlistment on August 21, 1954, by an article and picture in the Fifth Air Force newspaper circulated in the Pacific area.
After plaintiff’s return to the United States and assignment to Shaw Air Force Base, he made a request for national security clearance.
9. Thereafter an investigation of plaintiff was conducted by the 6th District Office of Special Investigations at the request of the Provost Marshal, Ninth Air Force, Shaw Air Force Base, South Carolina, to determine “if homosexual tendencies still existed.” As a result of the investigation, plaintiff was advised on November 29, 1955, by his commanding officer at Shaw Air Force Base that it was intended that action would be requested against plaintiff pursuant to Air Force Regulation 85-66. In accordance with that regulation, plaintiff was tendered the option of applying for a discharge or appearing before a board of officers. Plaintiff elected to appear before a board. On December 1, 1955, a recommendation was duly made by plaintiff’s commanding officer to the commanding general of Shaw Air Force Base to appoint a board of officers to determine whether plaintiff should be discharged pursuant to AFR 85-66, and such appointment was duly made by orders dated December 9,1955. Commencement of proceedings of the board was delayed until March 28,1956, because of hospitalization of plaintiff for a spinal operation at Max-weE Air Force Base, Alabama.
10. The duly appointed board of officers held its proceedings on March 28 and 29, 1956, at Shaw Air Force Base, South Carolina. The board consisted of five majors and a first lieutenant, the latter of whom was the legal member. Plaintiff was present in person and represented by counsel. The board received in evidence the affidavits of Hedgepeth, Howard, and Adams, previously mentioned in finding 3 herein, plaintiff’s counsel stating that there were no objections thereto.
The board recorder then offered into evidence a photostatic copy of a written statement, dated September 25, 1953, purportedly in the handwriting of and signed by one Larry R. Hart, in which the assertions were made that the affiant *199 was an airman, that some unnamed master sergeant, known to the affiant as “Jake”, at Dobbins Air Force Base had taken Hart to a certain floral shop in Atlanta, Georgia, where another man committed fellatio upon Hart in the presence of the master sergeant. Plaintiff was neither named nor described in this document. The name of the floral shop was the same as that mentioned in the statements later given by plaintiff in Korea. The statement also contained admissions by Hart of passive participation in other acts of homosexuality with other persons. This document was obviously incomplete, as the pages were numbered from 1 to 6, except that there was no page numbered 3, and there was a lack of continuity between pages 2 and 4. Plaintiff’s counsel objected to this statement of Hart because it was not an original document, that there was no authentication of the document, that there was no proof of the signature subscribed to the document, and that the document was obviously incomplete and hearsay. Plaintiff’s counsel further stated that he had waived the appearance of Hedgepeth, Howard and Adams in connection with the previous statements admitted in evidence, subject to rebuttal testimony, but would not waive the appearance of Hart. Over these objections, the board admitted the Hart affidavit into evidence, subject to a showing that there was some connection between the statements therein and plaintiff. This affidavit was then read to the board, but thereafter the board ordered it stricken from the record, and the board members were instructed to disregard it.
The board recorder also offered into evidence the two statements made by plaintiff in Korea to the OSI agent, previously mentioned in finding 7, and the board received them in evidence over the objections of plaintiff’s counsel that these statements of plaintiff amounted to confessions and were inadmissible because no evidence in corroboration had been presented to the board.
The board recorder then offered in evidence two voluntary statements made by plaintiff on September 9 and 21, 1955, to an agent of the Office of Special Investigations, in which plaintiff admitted that when he was a teenager he had once submitted passively to the performance of an act of *200 fellatio upon him by a homosexual, that he had in 1951 upon inquiry by a prospective recruit advised where the recruit could find a homosexual who would commit fellatio upon him, that he had twice had the act of fellatio performed, upon him in Raleigh, North Carolina, at times prior to his psychiatric examination in 1952, and on three more occasions in Atlanta, Georgia, in 1953, and stated that since that time he had not engaged in any homosexual activities. These two statements of plaintiff were admitted in evidence by the board over the objections of plaintiff’s counsel that they were confessions without any evidence in corroboration.
At the request of plaintiff’s counsel, the plaintiff was on March 8, 1956, given a psychiatric examination prior to the board proceedings, pursuant to the terms of AFR 35-66, at the Mental Hygiene Clinic, Fort Jackson, South Carolina. The purpose of the psychiatric study was to determine whether or not plaintiff had homosexual tendencies. The examining psychiatrist, Captain W. S. Mizell, made the following report:
Psychiatric evaluation of this 46 year old, white, male, Air Force Master Sergeant does not reveal amoral or “abnormal moral tendencies.” Although he admits having allowed some acts of fellatio to be performed on him during past years, examination shows that he does not possess habitual nor uncontrollable homosexual tendencies in the true psychodynamic sense. In view of the fact that this man’s past history of participation in homosexual episodes came to light as result of routine security clearance, that he was investigated and cleared, and that he was previously investigated and cleared, and finally that he has consciously refrained from such acts in recent years, the previous willingness to participate in such acts is considered to have been overcome. Psychiatric evaluation at this time does not reveal any overt homosexual tendencies nor any condition which would contraindicate this man’s retention in Military Service.
Recommend that he be retained in Military Service.
This report was received in evidence by the board as an exhibit in behalf of the plaintiff.
Plaintiff was sworn and examined in his own behalf before the board. He denied the accusations against him *201 in the statements in evidence of Hedgepeth, Howard and Adams. He testified that he had had fellatio committed npon him once at the age of 17 years by a male motorist who had picked him np as a hitchhiker, twice in 1949 by homosexuals in Ealeigh, North Carolina, when he had been drinking heavily, and twice in 1953 by the male proprietor of the floral shop in Atlanta, Georgia, when plaintiff was intoxicated. He stated that except for those five occasions, he had never participated in any homosexual acts in any way, and that in the case of all five exceptions he was the passive participant. He stated that he would never participate in such acts again and that he had permanently stopped drinking intoxicants, having had only two beers in the last eighteen months.
Four Air Force enlisted men who had been associated with plaintiff in the service testified that plaintiff had never discussed homosexual matters in their presence, nor engaged in any abnormal conduct in that respect, and that plaintiff’s reputation for morality was good. In addition, the board received in evidence about 25 letters from former associates and friends in and out of military service, attesting to plaintiff’s good character. It was also shown in evidence that on several occasions throughout his various enlistments, plaintiff had received good conduct medals or citations, the last one in July or August 1955.
The transcript of proceedings of the board of officers shows that there was no evidence that plaintiff participated in any acts of homosexuality after 1953, or after his reenlistment on August 21, 1954. Plaintiff’s testimony before the board stands unrebutted that he had completely refrained from such conduct since 1953. All of the evidence presented to the board concerning misconduct of the plaintiff was in the possession of the Air Force prior to plaintiff’s reenlistment on August 21, 1954, except plaintiff’s two statements made in September 1955, and those two statements were in all material respects like the previously-mentioned statements of plaintiff taken by the Air Force agent in Korea in March and April 1954.
*202 11. After tbe closing of proof and presentation of oral arguments by plaintiff’s counsel, tlie board of officers on March 29, 1956, made the following findings and recommendations:
FINDINGS: That Master Sergeant Jesse F. Murray, AF 14073711, did engage in passive homosexual activities when 17 years old and later twice during 1949 and twice in 1953.
Recommendations: Recommended that: 1. Respondent be discharged from the USAF under the provisions of AFR 35-66. 2. Respondent be furnished a General Discharge certificate.
MINORITY RECOMMENDATION:
First Lieutenant Frank P. Della Posta, Legal Member of the board, concurs in the findings of this board, but does not join in the recommendation that the respondent be granted a general discharge, since it is inconsistent with the factual determinations.
In view of present Air Force policy, as enunciated in AFR 35-66, that the respondent’s efficiency and past favorable service record should not be reflected in the board’s final recommendation, this officer recommends that an undesirable discharge be given to the respondent.
12. By letter dated April 27, 1956, the commanding general of the Shaw Air Force Base, who had appointed the board of officers to hear plaintiff’s case, advised the Director of Military Personnel, United States Air Force, Washington, D.C., as follows:
1. Recommend airman be separated under the provisions of AFR 35-66 and furnished an Undesirable Discharge Certificate.
2. I do not concur with the recommendation of the board that airman be given a General Discharge Certificate as it has been continuously emphasized that the manner of his performance of duty does not affect the type of discharge which will be effected (reference paragraph 2c, AFR 35-66; your letter dated 10 March 1955, Subject: “Disposition of Cases Under Provisions of AFR 35-66”; and your message AFPMP 125134, 29 November 1955). This information has been brought to the attention of my Commanders.
*203 3. Evidence indicates airman has participated in ■numerous acts of homosexuality (passively) during the period 1948 thru 1953. No recent acts are known. _ In accordance with paragraph 2b (2), AFR 35-66, this is defined as a Class II case.
4. In view of the circumstances involved trial by court-martial is deemed inappropriate.
5. AFR 39-21 is not applicable as there is no evidence of willful concealment of any homosexual acts prior to current enlistment of 21 August 1954.
6. The question is posed as to whether this administrative action against the subject airman can be revived inasmuch as he has been discharged and immediately reenlisted since commission of the homosexual acts.
7. Nevertheless, I feel his retention could possibly be inimical to the interests of the United States since he holds a sensitive position by virtue of his noncommis-sioned officer status (paragraph 6b, AFR 35-62) and has been exposed to the expressed acts as stated herein. In the event airman cannot be separated under the provisions of AFR 35-66, recommend action be taken in accordance with paragraph 6c(3), AFR 35-66.
8. This case was delayed due to the hospitalization of airman and the detailed administrative action necessary.
13. On May 2, 1956, upon recommendation of the Air Force Personnel Board, the Secretary of the Air Force directed that plaintiff be administratively discharged under the provisions of AFR 35-66 and that he be issued a general discharge certificate.
By special orders issued by the commanding officer of the Shaw Air Force Base on May 7, 1956, plaintiff was discharged from the Air Force “under honorable conditions,” effective May 9,1956, under the authority of AFR 35-66.
14. At the time of plaintiff’s reenlistment on August 21, 1954, he was paid a reenlistment bonus of $947.82, granted to him by the Air Force in consideration of his reenlistment for six years. At the time of plaintiff’s discharge on May 9, 1956, plaintiff had served 1 year, 8 months, and 19 days of his six-year enlistment, leaving unserved 4 years, 3 months, and 11 days. The Air Force prorated $271.62 of the entire bonus payment to the time served by plaintiff in the six-year enlistment, and charged plaintiff with liability *204 to refund the balance of $676.20 for tbe unserved part of the enlistment.
At the time of his discharge on May 9,1956, the Air Force computed that plaintiff had accumulated leave credit in the amount of $276.25, and accrued pay and allowances in the sum of $115.29, or a total of $391.54. This total sum was withheld by defendant and applied in reduction of the above-mentioned claim of $676.20, leaving a balance of $284.66, which sum has not been paid by plaintiff to defendant and is the amount of recovery sought by defendant in its counterclaim.
15. On June 18, 1956, plaintiff applied to the Air Force Discharge Review Board for a review of his discharge on May 9, 1956, seeking an honorable discharge and deletion of all reference to AFR 35-66. His case was heard by this board on October 19,1956. Plaintiff was present and testified at the hearing, and was represented by counsel.
The Air Force Discharge Review Board decided on October 23, 1956, that plaintiff’s appeal should be denied.
16. Under date of November 5, 1956, plaintiff forwarded his application, with supporting brief and statement of facts, to the Air Force Board for Correction of Military Records, in which he requested “Change of discharge to honorable discharge and deletion of all reference to AFR 35-66 as authority for separation. Payment of accrued leave, accrued pay and other improper deductions from pay.”
By letter dated February 4,1957, this Air Force board advised plaintiff that “a careful consideration by the Board of your military record, together with such facts as have been presented by you, fails to establish a showing of probable error or inj ustice in your case. Therefore, in the absence of additional material evidence tending to show the commission of an error or injustice, no further action on your application is contemplated.”
17. At the proceedings of the board of officers at Shaw Air Force Base, in the hearing before the Air Force Discharge Review Board, and in his brief attached to his application to the Air Force Board for Correction of Military *205 Eecords, plaintiff maintained tbe position that plaintiff could not be legally discharged from a current enlistment on the basis of misconduct that had occurred in a previous enlistment.
18. On May 6, 1956, the Air Force conducted a physical examination of plaintiff for the purpose of his discharge from the service. The report of examination showed that plaintiff had had a laminectomy performed upon his spine in 1955, that plaintiff had a 50 percent limitation of motion of his back, and that he should be subjected to no heavy lifting, prolonged standing, or excessive fatigue. Plaintiff was not processed by the Air Force for determination of the extent of his disability, or whether plaintiff was entitled to disability retirement and to disability retired pay. Subsequent to his discharge on May 9,1956, the Veterans Administration made a finding that plaintiff had a service-connected disability of 60 percent, and plaintiff has received disability compensation from that agency.
19. By agreement of the respective parties, and with the approval of the trial commissioner, the trial of this case, both as to the petition and the counterclaim, was limited to the issues of law and fact pertaining to the right of either party to recover, reserving the determination of the amount of recovery, if any, for future proceedings.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 2,1962, that judgment for plaintiff be entered for $15,998.82.

 The statute referred to by the Court was Title 38 Ü.S.C. § 693(b) (1952 Ed.) which created boards authorized to review actions of the service Secretaries. under the statute, the findings of these boards “shall be based upon all available records of the service department relating to the person requesting such review * *

 Title 10 U.S.C. § 652(a) (1952 Ed.).

 AER 39-10 incorporates the provisions of AER 35-66, if applicable, by reference. However, paragraph 6 of the latter regulation specifically permits the granting of an honorable discharge in cases like the present one, even i£ proceedings are conducted under AER 35-66,